et al., Ms. Gleason, and is it Merrick Lee, is that my semi-close? Yes. Okay, thank you. Thank you. Thank you.  Good morning, and may it please the Court. My name is Margaret Gleason, and I represent the appellant, Mr. Anthony DeFranco. And what is the strongest position that you have? Do you wish to reserve any time for rebuttal? Yes, please. If I may, I'd like to reserve three minutes for rebuttal. That's fine. Thank you. I beg your pardon. What is the strongest point that you make of the various counts that you have? For all three of the claims, the district court misapplied the summary judgment standard by weighing credibility, weighing evidence, and drawing inferences in favor of the Department of Corrections and against Mr. DeFranco, the non-movement. I mean, you also, on the one issue on qualified immunity, don't you have a pretty strong argument there that it was never raised? Exactly. I think we have, with respect, several strong arguments. It's worth pointing out with the qualified immunity defense that not only was it raised for the first time here on appeal in Appley's brief, it's also limited only to one claim and one defendant. So it certainly would not dispose of the case. But I agree. I think it was inappropriate to raise for the first time. The district court did not have that issue before it, and the district court did not make a decision on that issue. Can we entertain it? Well, that would be, I guess, up to you. I've cited cases in our brief which say that. Do you think we can entertain anything we want to? No, I really don't. I really don't. I believe the cases that we cited in our brief and our reply brief. Would you tell that to some of my colleagues? I'd love to. The cases in our reply brief, the cases that we located, stated expressly that this court should not consider qualified immunity for the first time on appeal. And, in fact, the cases cited by Appley don't really, in any way, provide authority for the opposite conclusion. So the qualified immunity argument really ought to be off the table at this stage. All right. Now let's go to Judge Garst's question. You've got three claims here. You've got the First Amendment claim for the statement made that I'm going to sue, and then he loses his status, single cell status. You've got the claim that as a result of the suit he's transferred, was it from Albion to Smithfield? Yes. And then the third is the Eighth Amendment claim. Now, just working backwards, it would appear that the Eighth Amendment claim here, it's pretty tough to make that claim that there really was deliberate indifference, in this case with respect to the medical condition. That would appear, it would seem to be a pretty weak argument. Well, I disagree respectfully. First of all, the Appley's. I should say compared to the other two. Perhaps that's true. With respect to the Eighth Amendment claim, Appley's don't seriously contest the deliberate indifference prong. So really the only dispute seems to be whether or not Mr. DeFranco provided sufficient evidence to survive summary judgment on whether there was a serious medical need. Here we have the written letters of his treating psychiatrist, a prison psychiatrist, recommending single cell precisely because of his medical. Let's assume that we all agree there was a serious medical need, just for the sake of argument. Where is the deliberate indifference? I think the deliberate indifference is shown by the fact that each of these defendants knew of that need. They knew that the psychiatrist had recommended it. But here there was a legitimate difference of medical opinion. Well, that's not what we're contesting. Here there was a difference of medical opinion, perhaps, as to whether there was a medical need. But those defendants who knew that the psychiatrist had recommended it and did nothing, displayed indifference to that need. And under the standards set forth in this Court's decision in Lanzaro, they clearly meet deliberate indifference. There are several ways to prove it. I don't understand either. I don't understand that. Deliberate indifference to me, and you might as well know because you're going to have to satisfy me as at least one member of the panel, is when a prisoner has a broken arm and it's sticking out in the compound fracture, and they do nothing about it for five months, and then they prescribe an aspirin. That's an extreme case, of course. In this case here, they had Lindemuth's testimony, and she recommended that he be single-celled. Of course, that was later retracted. Other prison officials did not. Does the prison board that considers placement of prisoners in single cells or multiple sharing, do they have to accept that kind of testimony? Can they listen to it, decide that penological necessity requires that he be in a shared cell, and say, thank you for your testimony, Ms. Lindemuth. We appreciate it, but the prison psychologist has said something different, and we feel that in multiple cells, okay. Why is that indifferent, deliberate indifference? Well, first of all, Dr. Lindemuth was not the only person who recommended it. His brother also testified. But in addition to that, the defendant, chief psychologist at SCI Albion, Defendant Riley, recommended single-cell in the first instance in 2000 and also voted to reinstate it in 2004. Why isn't that tantamount to perhaps malpractice? Malpractice is a vastly different thing than deliberate indifference. Well, I would state that if you look at Lanzaro, the deliberate indifference prong is measured by evolving standards of decency. And when prison officials deny reasonable requests. Just at base, if you have a difference of opinion of medical experts, and because they differ, how can we possibly say that is a constitutional violation? Well, this is not merely a difference of opinion as to treatment. In other words, the prison doesn't act your way, it's a constitutional violation. If they act your way, it's not. But that's a pretty low threshold for constitutional violation, isn't it? Well, it's a bit of a catch-22 for an inmate when there is medical opinion which says treatment is needed and someone else disagrees. In such a case, it doesn't seem correct to me that you could never state a constitutional violation. It's not technically catch-22, Yossarian, but that's okay. Okay. Isn't there an issue of prison security and an issue of the administration of the prison by the prison administrators in a way that, with the resources they have and the security necessities, gives them a certain amount of leeway that you might not find in another setting? Yes. You're not entitled to your treatment of choice, and prison officials are entitled to deference in safety and other measures. But here, there was testimony from Defendant Barr and others that they could have moved him to a single cell, and they didn't. And, in fact, in that situation, the recommended treatment here was available. The fact that the officials refused to provide it was not grounded in some concern about safety or budgetary concerns. Rather, it was available, they knew about it, they knew that a psychiatrist and their chief psychologist recommended it, and they failed to give it to him for allegedly non-medical reasons. So, in my view, that is sufficient for deliberate indifference. And, at the very least, there are issues of fact here as to the credibility and the stated reasons for each of the defendants' action or inaction. And, certainly, where appellees concede that there is some difference in medical testimony here, Mr. DeFranco is entitled to present this to a jury. The question was the difference in medical testimony. I would suggest to you, unless my colleagues have other questions, that you get on to your First Amendment. Why don't you begin with the two First Amendment claims. The one where he makes the comment within, I guess, ten days or so, he has a single cell status taken away. Now, you certainly have temporal proximity there, but what else do you have in addition to that? The vote was five to nothing, wasn't it? With respect to that vote, I believe you're correct. With that vote, I think there were other circumstances which call into question the motive for taking it away. If you look at Ms. Eichenlaub, the psychologist at that stage, if you look at her referral form, she met with him briefly. It's in the record that he doesn't recall that. She wrote a report one month later, and if you read the report, it's almost a foregone conclusion that it will be taken away. Defendant Showers and Jackson write on the form, this inmate is manipulative. He doesn't need single cell. They did not contact psychiatry. They did not contact his previous unit, which is the admitted protocol, when an inmate has been moved. The timing was unusual. So all of these circumstances give reason to doubt that the motive here was appropriate. I'd like to move on to my first claim, if I can. Marina, add two more minutes, please. I think the panel has already indicated that perhaps some of the stronger claims are the First Amendment claims, and perhaps the strongest, to finally answer your question, Judge Garth, is the retaliatory transfer claim. Here, this is a case where the district court looked at it for the first time in its June 12th opinion, and got it right, and found that on this record, summary judgment was inappropriate. This is a rare case where not only do we have suggestive temporal proximity, we have direct evidence of Defendant Barr's reason for the transfer. The transfer petition states that the transfer was, quote, due to litigation against William Barr. The response to the transfer grievance also- Who made that statement? That transfer petition- Who made the statement due to the litigation that Mr. Barr referred to? I don't know at the top of my head. I can check for you and let you know at rebuttal. I believe that it was an administrator, but in the pleadings below, Defendant Barr acknowledged that that was his reason, and that was his rationale. And wasn't there a single cell available in Dallas that was not available in Albion? Well, the question about SCI Dallas is interesting. There's a dispute of fact as to whether or not Barr threatened Mr. DeFranco with transfer to SCI Dallas. Wasn't there a single cell available in Dallas when there was none available in Albion unless they moved a prisoner from a single cell into a multiple cell and then gave the now vacant single cell to our friend DeFranco? I believe that the record shows that the Dallas reference was a rhetorical reference. I did not see any evidence that anyone had checked to see that there was a cell in Dallas. It was more of a comment to the effect of, for example, you may end up at SCI Dallas, which happens to be far away. Defendant's sole contention on this retaliatory transfer claim is that the transfer would have taken place absent the protected conduct. And we would submit that that's illogical when the stated reason for the transfer was precisely the protected conduct. Here, the defendants do not dispute, first of all, constitutionally protected conduct or adverse action. The only issue is whether or not the transfer was intended for retaliation or for some legitimate purpose. But it's not enough that the defendants can articulate some legitimate penological interest. They must prove it's their burden that the transfer would not have taken place absent the protected conduct. And here, where their own records show that that was the stated reason, we would submit that Mr. DeFranco has at least shown one of the claims made that his tennis shoes, which were valued at $53.99, were disappeared and that Mr. Barr said that they would replace them or that they would remedy the effect of their loss by giving him $53.99 back in his prison account. You're correct that the first grievance, the one that led to the removal of Zcode, was based on lost property while he was in the RHU. But I'm not sure that it's really material what was lost, what its value was. Under a la v. Sieverling, you certainly don't have to prove that you have a liberty interest or something to that effect underlying your retaliation claim. If officials take action against you in retaliation for protected conduct, that's enough to state a First Amendment violation. The grievance about the tennis shoes went to Barr, right? Barr was the grievance coordinator. Barr certainly, by his own admission, got involved and was the grievance coordinator. DeFranco is saying, Barr is prejudiced against me. Anything I do, he's going to decide against me. I gather there has been a policy that when you have a prisoner and a grievance coordinator who absolutely can't get along, that they try to transfer the prisoner, and certainly that's a lot easier than transferring the grievance coordinator, isn't it? I see that my time is up, but I would like to answer. When you have a situation like that, when DeFranco is convinced that the whole grievance process is against him, then there is a good policy, is there not, in transferring him out of the situation that he says is hopeless. Certainly, it's easier to transfer him than it is to transfer Barr. Well, here, the only evidence of this focus, this obsessive focus on Defendant Barr is from Barr's own unsubstantiated declaration. So it's not truly evidence in the way that in the case that defendants cited, Burke versus Romine, there was a finding by a disciplinary officer of hostility. Here, that's really not what we have. And moreover, just a few weeks after the transfer took place, the superintendent reversed the decision, which really calls into question that there was a problem for the grievance process. So, you know, we would submit that the record shows that DeFranco had an appropriate focus on Barr in the pleadings, not some bete noire as stated in Apolli's brief. And so Defendant Barr's unsubstantiated allegations pointing only to protected conduct and the argument of counsel in their brief of a bete noire or unhealthy focus is simply not enough to base summary judgment on in this case and to credit Defendant Barr's later stated reasons for the transfer. Thank you. Thank you. Now, were you counsel before the district court? No. No, you're pro bono, right? Pro bono, right. Yes. Okay. Thank you very much. I appreciate the good work that our pro bono counsel did. Thank you. Absolutely. Ditto. Thank you. Mr. Merkley? Good morning. May it please the Court. My name is Kamal Alexander Merkley. I have been to Turkey, and I realize that the C is a chip. Thank you, Your Honor. But it's certainly not phonetically consistent with the way we pronounce things in English, so I'm quite accepting of any other reading. But I appreciate that. I'm counsel for the appellees in this case. The first question is with respect to, just to bat it out of the air, showers. What case is there that gives any support that you can raise a matter for the first time on appeal relating to qualified immunity and is not waived? There's a case from the Fifth Circuit that's precisely on point. It's called Kaiser v. Garrett. I found it after I briefed. What's the site? 67. What is it? 67, Fed Third, 1166, Fifth Circuit, 1995. Why didn't you send us a 28-J letter regarding that? I neglected to do so. Because I don't know that case, and I would have to read it in order to confirm the fact that it says what you say. You sent the Supreme Court in 2002 saying that sovereign immunity can be waived if it isn't brought up. So if sovereign immunity can be waived, how in the world do you expect us to say that qualified immunity shouldn't be waived? Let me explain. First, my learned opponent's cases had to deal with circumstances in which an appellant was appealing the denial of a motion for summary judgment that failed to raise qualified immunity. I don't think there's any question under those circumstances that qualified immunity cannot be raised for the first time on appeal. But an appellee may rely on the ruling of the court below if it is correct for any reason, not merely the reason on which the court below relied. That's what the Fifth Circuit says. And in the circuit... Doesn't that any reason have to include, require that the issue was raised in the court below? Yeah, you've got to put it before the court. You've got to tee it up. I don't believe so, Your Honor. I think what they said in Kaiser was it was a case involving a group of social workers who had deprived a family of their child, and the question was whether or not that had violated substantive due process, and also whether or not it had violated procedural due process in the sense that they hadn't given them adequate notice to contest. So what's the rationale? The rationale was qualified immunity is an issue of law subject to a standard of review. This court can engage in plenary review of the record before it, viewing the evidence in the light most favorable to Mr. DeFranco, and decide whether or not our claim of qualified immunity would nevertheless apply. Now, I understand it requires all inferences to be taken in favor of Mr. DeFranco. It requires all facts to be viewed in favor of Mr. DeFranco. But there's no reason why you can't decide, as a matter of law, whether or not the issue of whether a threat to sue was clearly established as a violation of the First Amendment at the time, 2002, it was allegedly made, or not, is the case. Qualified immunity is immunity from suit, from having to stand trial, and ultimately from judgment. Now, here, and the courts have said you need to have, obviously, this brought up from the outset so that we can resolve this preliminary matter as soon as possible. So here the suit's already begun, and it's now on appeal. Now, conceivably, there's an argument that it's also immunity from judgment, and maybe one could argue you could bring it up. But if that's the case, why doesn't sovereign immunity get the same treatment? You know, in fact, that's about as big immunity as one can get, and yet the Supreme Court says it can be waived. I can't reconcile the two principles, but I do know the Kaiser court talked about that. But we're not the Fifth Circuit. That's true. But the fact that what the Fifth Circuit said was the fact that most of the benefit of qualified immunity has already been squandered by the belated raising of the issue is not a good enough reason to allow the latecomers to the feast, so to speak, to at least have what's left over. Okay. Why don't you turn to the two First Amendment claims? I'm sorry. Certainly. Qualified immunity can be waived, right? Qualified immunity can be waived, but we raised it in our answer in this case, and that's primarily the reason why it isn't raised, waived in this particular case. There was a case in which Judge Ambrose sat. It's not a precedential case, but it's called Bennett v. Murphy, and it's in the Third Circuit. That was a case where a case had been tried on an excessive force claim in a fatal shooting by the Pennsylvania State Police to verdict, and then it was a defense verdict, but Judge Sindrich of the Western District, on a motion for a new trial, reversed and awarded a new trial, and qualified immunity was raised for the first time before the retrial. That's a different set of facts. It is a different set of facts, but it is a situation where the appellees had already undergone a complete trial by jury to verdict without ever attempting to develop the issue that they had raised in their answer with regard to the affirmative defense of qualified immunity, and some of the same concerns were present there and addressed about whether or not there was an estoppel or a waiver. Would you just repeat the citation? I don't think I've got it correctly. It's 67, Fed Third, 1160. 67? Yes. Fed Third? 1166. 1166. What year was that? 1995. 1995. Ah. May I supplement my inadequacy by providing you with a letter that's not necessary? No. All right, thank you. At this point, why don't you turn to the First Amendment claims? Okay. Thank you, Your Honor. In respect to the First Amendment claim involving the removal of his single cell status called Z code in DOC parlance, that is the claim to which our qualified immunity argument is intended to apply. What's the test that we should apply for causation? The test for causation is a separate matter. That's what Judge Cohill relied upon. And we don't concede it was an error. But the test for causation in that case should be something more. The court cited deflaminus, right? Pardon me? The court cited a case called deflaminus, Lauren W. X. Rel. Gene W. B. Deflaminus. Yes. Yes, Your Honor. It did. And does that apply in the prisoner context? I believe it does, Your Honor. And so that test is to establish the requisite causal connection. A plaintiff usually must prove either 1, an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or 2, pattern of antagonism coupled with timing to establish a causal link. So we don't have the second at all. So we have the first here. No, Your Honor. Because I think now Ms. Gleason was absolutely correct that the staffing, the question of whether or not he should have. No, I'm saying the test we have, we go into the first test here, correct? Yes. Yes, Your Honor. Okay. And so you have within comment made and the comment made back by showers that, you know, we know how to deal with people like that or something to that effect. And then 10 days later he loses his Z code staffing. No, actually he lost the Z code six weeks later. The process which ultimately led to him losing. Started 10 days later. Started 10 days later. Yes, Your Honor. And I make a different, I make a distinction between the ultimate process and the fact that it began, especially in circumstances where Mr. DeFranco was transferred from one housing unit to another. He had been found guilty of a misconduct on his former housing unit where his single cell status was annually reviewed in due course. But he'd been transferred to a new unit and there's no contradiction of the testimony and affidavits we have that in that circumstance the annual review no longer applies because he's in a new cell setting. There was the psychiatrist, the psychologist rather, who said, I don't see why his medications aren't adequate to deal with his anxiety and his psychological issues. There was the fact that the staffing itself therefore became routine and the actual removal of the Z code status was about six weeks after it was on June 24th and he alleges that the comment was made on May 10th. So I don't think that's particular. May or April? He says May, May 10th. And May 20th the staffing process was initiated, but the staffing process itself did not conclude until June 24th. Now what about the second claim from the First Amendment, that he was transferred because of his bringing the suit and there is an argument that there's a legitimate peniological interest in transferring him because if there's a problem with the grievance counselor that this makes sense. Is there a policy to that effect, that when there is a dispute between a grievance counselor or someone else in the prison and a prisoner, that you look to transfer the prisoner for the sake of prison concerns? I don't think there's a specifically articulated policy at that level of specificity. What there is, and it's reflected in an unpublished decision of this court as well. Have other people who have brought suits, have they not been transferred? I'm quite certain that other people who have brought suit have not been transferred. So doesn't that defense become a little weak? The defense has to be specific to particular circumstances. Now I recognize that candor is a duty I owe to the court. The most difficult issue in this case, albeit one viewed through the biased eyes of the advocate, is the one we're talking about right now. It's the question of whether or not the fact that he sued Mr. Barr somehow implicates his First Amendment rights. And the problem that we face is if it were indisputable that the only reason he was transferred is that he dared to sue a member of the prison staff, namely Mr. Barr, the superintendent's assistant, there would be no doubt his First Amendment rights would be violated. There would be no doubt he'd be entitled to relief. Our point is setting aside whether or not there was a retaliatory animus, setting aside whether or not there was a vindictive motive, nevertheless, if we're able to point to a legitimate penological purpose that nevertheless would justify this action for which there is no material disputed fact, then we ought to prevail by carrying our burden of proof. How do you distinguish the Rausser case? Go ahead, I'm sorry. That is the Rausser case, and that's our position. Aren't these facts even more in Ms. Gleason's favor than those facts in the Rausser case? These facts are more in Ms. Gleason's favor, but they fail ultimately in the last analysis, and that is because if you take our position. Wait a minute. Didn't you just put the rabbit or leave it out of the hat? I mean, if these facts are more in favor of Ms. Gleason than were the facts in Rausser, and Rausser was remanded back, then doesn't this call for a vacation and remand? No, Your Honor, because there's a distinctive difference from Rausser in this particular case, and that is the nature of the lawsuit itself and the grievances that led up to the lawsuit indicate such a particular degree of rancor with an individual who is so centrally related to the administration of the grievance process, and at the same time involves an individual prisoner, an inmate, who is given to such recourse and involvement with this is a very articulate man. This is a man who has engaged the grievance process more than is ordinarily the case. It's very important to him. He has kept up an ongoing dialogue through the grievance process, and now in circumstances which I think can't be disputed, a relationship that he had always viewed as one that he could rely upon. He had made many demands of Mr. Barr, and they had always been met, and finally a bridge too far was reached, and his reaction was to become completely disgusted with Mr. Barr and completely unreasonable and unfair in relation to Mr. Barr, and it was the very rancor we saw in the lawsuit. I grant you a very nice point here, but the very nature of what the lawsuit reveals of this rancor that was the reason that we. . . I think not because I don't think anyone can seriously dispute what I just said and the nature of the record. I'll bet they do. I'll bet Ms. Gleason disputes it. She's looking disputative right now. Well, she's a. . . Before you sit down, and I realize your red light is on. Just add two more minutes, Maria. Thank you, Your Honors. I think you ought to give some thought about the statement that you made, which may become part of the record or transcript here. You said that you had at prison people who had brought suit against others and remained at the same prison, and you said almost in the same breath that there was no doubt that this would be a First Amendment violation. Now, I can't believe that you really adhered to that proposition. Do you want to just clear it up for the record? Certainly. What I'm arguing is that in this particular, to borrow a term from contracts law, in this particular situation, there's a condition subsequent on which we carry the burden of proof but which cannot be materially disputed in terms of its facts that saves us from what otherwise would be an undoubted basis for reversal. And that condition subsequent is the fact that no one can deny that at this point, Mr. Barr unreasonably is hated by Mr. DeFranco, who cannot give him the benefit of any doubt in any way. Okay. Thank you. Okay. Thank you. Ms. Gleason? Thank you, Your Honors. Thank you. With all respect to counsel, I think that there's nothing in the record that evidences this degree of inappropriate focus or hatred. There's only the unsubstantiated allegations in a declaration which point to Mr. DeFranco's protected conduct. His pleadings in the case, his advocacy in the case. And so it would be inappropriate, in my view, in this case, to find that there was sufficient hostility to somehow make this transfer appropriate, especially when the superintendent reversed it. Secondly, I think that the test, the Rausser test, is the test. There's no dispute. And with respect, counsel for Appleby's misstated it. It is not enough to articulate some legitimate penological interest. Once Mr. DeFranco has made his prima facie case, which Appleby's argument would concede, then the burden shifts to the defendant. And the defendant must prove that he would have taken the same action, absent the protected conduct, for a legitimate penological reason. It's not merely enough to articulate a legitimate reason. The defendant must prove he would have taken the same action. And here, as I stated before and don't want to repeat, where the actual stated reason was due to litigation, it's simply not logical that the action would have been taken without the litigation. Judge Roth, you asked, or perhaps one of you asked, whether or not Defendant Barr had signed the transfer petition. Maybe it was Judge Ambrose. And I just wanted to point you to the record. In his second declaration at the Joint Appendix on page 270, paragraph 10, Barr states, I requested the transfer. In addition, he initialed the response to the grievance, which stated the rationale for the transfer. And that's also in the Joint Appendix, I believe, at between 255 and 258 among the transfer documents. Thank you. The one other thing I would like to press, although I understand that the panel feels that the deliberate indifference claim might be the weakest one, I just took a second look at the language on deliberate indifference under this Court's standard in Lanzaro. And while the primary test, or the first stated standard, is that mere allegations of malpractice are not enough, nor does mere disagreement as to the proper care rise to the level of a constitutional violation, this Court has also said, quote, where prison authorities deny reasonable requests for medical treatment, however, and such denial exposes the inmate to undue suffering or the threat of tangible residual injury, deliberate indifference is manifest. They also state, in this opinion, where knowledge of the need for medical care is accompanied by the intentional refusal to provide that care, the deliberate indifference standard has been met. Prison officials may not, with deliberate indifference to the serious medical needs of an inmate, opt for an easier or less efficacious treatment of the inmate's condition. When prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access, then we have a deliberate indifference standard that's been met. So I would submit that here there certainly was enough on each of Mr. Franco's claims to survive summary judgment, and I would ask this Court to reverse and remand so the case can go to trial on all three claims. Thank you. Thank you very much. Thank you. And thank you again for taking this case on a pro bono basis. It's very much appreciated by us. Thank you. We'll take the matter under advisement and call the next case.